# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 25, 2016 at Knoxville

## STATE OF TENNESSEE v. APRIL LAMB

**Appeal from the Circuit Court for Rutherford County**
**No. F-71685    David Bragg, Judge**

---

### No. M2016-00461-CCA-R3-CD – Filed November 30, 2016

---

The defendant, April Lamb, appeals her Rutherford County Circuit Court jury conviction of aggravated assault, claiming that the evidence was insufficient to sustain her conviction and that the trial court erred by admitting certain evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Daniel L. Graves II, Murfreesboro, Tennessee, for the appellant, April Lamb.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William C. Whitesell, District Attorney General; and Dana Minor and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Rutherford County Grand Jury charged the defendant with two counts of aggravated assault and two counts of domestic assault arising out of a physical altercation with the victim, her then-husband, Jeremy Lamb. The trial court conducted a jury trial in May 2015.

The State's proof at trial showed that, on the evening of November 8, 2013, Officer Kenneth Collins with the Murfreesboro Police Department ("MPD") was dispatched to the parking lot of a Dollar Tree store to assist a "victim from a domestic violence assault [who] had fled to that parking lot and was waiting for police." When Officer Collins arrived, he located the vehicle matching the description from dispatch and encountered the defendant. As she got out of her vehicle, the defendant was not wearing

shoes, was "very upset" and "very angry," and "smelled of alcohol." Officer Collins quickly concluded that the defendant was intoxicated, and the defendant admitted that she had been drinking.

The defendant told Officer Collins that, earlier in the evening, the victim awoke from a nap, "flew into a rage," and immediately began to assault her. The defendant explained that the victim had "punched her in the head repeatedly" and "drug her around the residence" before she was able to free herself, get into her vehicle, and drive to the Dollar Tree parking lot. According to Officer Collins, the defendant made no mention of a knife, a skillet, or any injuries sustained by the victim. Officer Collins did not notice any injuries to the defendant, but he called for paramedics to transport her to the hospital for examination.

Officer Collins testified that he initially believed the defendant's story and filled out a domestic violence report listing the defendant as the victim and the victim as the suspect. While waiting for the ambulance to arrive, the defendant asked Officer Collins "[a]t least five" times if he was going to arrest the victim.

After the defendant was transported to the hospital, Officer Collins proceeded to the Lamb residence and knocked on the door several times before the victim responded. When the victim came to the door, Officer Collins noticed that he was "badly injured" with a "large knot on top of his head that was bloody." Officer Collins also noticed that the victim was "bleeding from his arm" and had "a bite mark on his side." Through Officer Collins' testimony, the State introduced into evidence photographs of the victim's injuries. The State also introduced into evidence an iron skillet which weighed approximately eight to ten pounds and a folding knife. Officer Collins conceded that, when he first encountered the victim at the scene, the victim "smelled of alcohol," but Officer Collins noticed no other signs of intoxication.

When Officer Collins asked the victim what had happened to his head, the victim responded that while he had been asleep on the sofa, the defendant had struck him in the head with a skillet. He also stated that the defendant stabbed him with a knife.

Officer Collins spoke with the defendant at the hospital a short time later and asked her to "be more specific" about the incident with the victim. At that time, the defendant stated that she "didn't remember what happened, because she had suffered a concussion." When Officer Collins asked her specifically about the skillet, she replied that it had been used "in self-defense." Officer Collins pressed the defendant to tell him more, but she continued to maintain that her concussion had impacted her memory. Officer Collins spoke with medical professionals at the hospital and was informed that the defendant did not, in fact, have a concussion. The hospital gave Officer Collins

clearance to take the defendant from the hospital to the jail for booking on assault charges.

When the defendant realized that she was being arrested, she became "extremely angry" and "belligerent," stating to Officer Collins that she "should have just killed" the victim.

The victim testified that he and the defendant had been drinking and arguing "[e]arlier in the day" on November 8, 2013, and that, between 4:00 and 5:00 p.m., he had fallen asleep on the sofa in their residence. He recalled waking at one point and noticing that the defendant was seated in a nearby chair. The defendant was drinking, and the victim took note that his liter of Vodka "was pretty much gone." The victim fell asleep again and was awoken some time later when the defendant hit him in the head with a skillet.

The victim testified that the blow from the skillet "hurt quite a bit." He stood up and attempted to stop the defendant from hitting him again. In the process, he suddenly felt as though his arm were "on fire" and realized that the defendant had stabbed him in the arm with a knife. As the victim was trying to force the defendant out of the house, the defendant bit him on his side.

The victim explained that he did not contact law enforcement officers after the defendant left the residence because he had an outstanding warrant for a violation of probation. The victim was transported to the hospital for treatment.

After the victim was released from the hospital, he returned home and began drinking. The defendant called him twice from jail. Although the conditions of her release prohibited her from returning to their shared residence, the victim agreed to let the defendant return home. When she arrived at the residence on November 10, she and the victim resumed fighting. The victim testified that his intoxication prevented him from recalling exactly what had transpired, but he stated that he did remember the defendant's striking him five or six times, causing a cut over his eye. After the defendant left the house, the victim contacted law enforcement officers to inform them that the defendant had struck him and caused him to bleed.

The victim testified that he and the defendant were now divorced, and he denied hitting or assaulting the defendant in any way during either of the November incidents, explaining that he "knew that if the police showed up and she had any kind of a mark on her at all, that" he would be taken to jail. The victim also denied hitting himself in the head with the skillet or stabbing himself with a knife on November 8.

- 3 -

The victim conceded that he had a prior conviction for the domestic assault of the defendant and that he had been previously convicted of forgery. He also admitted that he had struggled with alcohol in the past and had been through rehabilitation "several different times." The victim stated that, as of the time of trial, he had been sober for three months.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal, the defendant elected to testify and chose to present proof.

The defendant testified that she had known the victim since high school, that the two had "reconnected" over social media in the summer of 2010, and that they had married in May 2012. The defendant recounted the victim's problems with alcohol, testifying that he was a "functional alcoholic." The defendant stated that, sometime in 2012, she returned home in the evening to discover that the victim had been "drinking all day." According to the defendant, the victim began "yelling at [her] and screaming at [her], cussing at [her], and pushing [her] around, asking where [she] had been and accusing [her] of cheating on him." The victim became increasingly more violent toward the defendant, "pushing her into a wall," throwing her "down on the bed really hard several times," and finally threatening to take "a piece of wood with nails sticking in the end of it" and "bash[ing her] brains in with it." The victim chased the defendant outside, and the defendant used her cellular telephone to call 9-1-1. The victim tackled her, but upon realizing that she had contacted the authorities, he fled to a nearby yard and hid. The victim was arrested, and he and the defendant later reconciled.

On the morning of November 8, 2013, the defendant and the victim argued over whether a counterfeit $100 bill should remain in the house. Because the defendant wanted the victim "to get rid of it," the victim grabbed the defendant and put a knife to her neck, threatening to "cut [her] f****** head off." The defendant testified that it was the same knife that had been admitted into evidence during the State's case-in-chief. Eventually, the victim released the defendant and locked himself in the bathroom. The defendant "assumed he was drinking in there, because he had his Vodka with him in there." The defendant then fell asleep on the sofa, and the victim fell asleep elsewhere in the residence.

At approximately 4:00 p.m., the victim awoke and "came in yelling and screaming at [the defendant] again." The defendant could not recall the reason for his outburst. The victim "passed out on the couch around 6:00." The defendant proceeded to consume "three Vodka with orange juice" cocktails while seated in a chair next to the sofa, where she eventually fell asleep. At 8:30 p.m., a woman pulled into the driveway,

and the defendant woke the victim, instructing him "to get his crack dealer away from the house."

The defendant testified that the victim jumped up from the sofa, upending the coffee table, and chased her into the bathroom, where he shoved the defendant into a wall. The victim continued to push and shove the defendant until he knocked her to the bedroom floor. He then straddled the defendant and began to choke her. The defendant "kick[ed] and claw[ed]" to stop the victim, and the victim began "punching [the defendant] in the back of the head" approximately "15 or 20 times." During this scuffle, the defendant bit the victim.

While the victim checked the bite wound, the defendant crawled to the living room. The victim then grabbed her by the torso and threw her against the wall, causing the defendant to black out. When she regained consciousness, she realized that the victim was dragging her toward the garage. Believing that the victim intended to kill her, she "reached into [a kitchen] cabinet" as he was dragging her across the floor, "grabbed the skillet," and "hit him in the head." The defendant explained that she did not "want to kill him or anything like that" but that she "just wanted to get away from him."

When the defendant struck the victim with the skillet, he released her. She immediately grabbed her handbag from the kitchen counter and ran to her vehicle in the garage. As the defendant was backing out of the garage, the victim followed her and attempted to enter the vehicle. When he realized that he could not open the door, he slammed his hand against the passenger-side window. The defendant drove to a nearby parking lot and called 9-1-1.

When she arrived at the hospital, she underwent a "C.T. scan and an x-ray, both on [her] shoulder and [her] knee, and a C.T. scan of the head." The defendant could not recall what Officer Collins had asked her at the hospital "because [she] could not think at that time." When the hospital released her and Officer Collins arrested her, he told her that the victim "gave a more clear story than [she] did, and [that] his injuries appear[ed] to be worse" than hers. The defendant admitted that she "went off" on Officer Collins, telling him that he "was going to ruin [her] life, make [her] lose [her] kids," and that "this was ridiculous."

The defendant explained that she had called the victim from jail to "do[] damage control." When asked why she had been "laughing and cutting up" during her telephone call to the victim from jail, the defendant testified that she was attempting "to manipulate" the victim.

The defendant admitted that she returned to the marital residence when she was released from jail even though she was violating the conditions of her bond. She noticed the cuts on the victim's head and arm, but she did not recall ever using a knife to harm the victim. The defendant took a bath and went to bed. When she awoke the following morning, she and the victim began arguing again, and he "started hitting [her] in the back of the head and slapping" her before eventually raping her. Following the rape, the victim went into the bathroom, and the defendant "heard some banging." When the victim reentered the bedroom, he had "blood running down the side of his face" from a cut over his eye.

The victim returned to the living room and resumed drinking. The defendant gathered her things and fled to her parents' house, where she was later arrested for violating the conditions of her release.

On cross-examination, the defendant stated that her memory had improved since the November 2013 incident because "things ha[d] come back to" her. When questioned about the position of her body when the victim was straddling her and was punching her in the back of the head on November 8, the defendant stated that she "was face up" and that the victim had reached around to the back of her head to hit her. The defendant insisted that she had had symptoms of a concussion on November 8, including head pain, blurry vision, and dizziness, and she testified that she believed Officer Collins had lied "[s]everal times" during his trial testimony to the contrary. The defendant conceded that she never reported the rape, explaining that she was "scared" because she had "never been raped before."

Jacqueline Harris, the defendant's mother, testified that she had received a telephone call from the victim on November 8, 2013, telling her to go to the hospital. When she arrived, she found the defendant "look[ing] pretty bad," recalling that the defendant "had a big goose egg on the right side of her head" and "a smaller knot" on the left side, along with "numerous bruises" on her arms and legs. According to Ms. Harris, a nurse at the hospital told her that the defendant had a concussion. Ms. Harris agreed that she would be "surprise[d]" to know that a doctor at the hospital had stated that the defendant did not have a concussion.

In rebuttal, the State called Kelly Haley with Providence Community Corrections. Ms. Haley testified that the victim had been placed on probation in 2011 for domestic assault, that he had undergone drug screens during his probation, and that he had never failed any of his drug screens, including a November 22, 2013 test for cocaine usage.

The State also called Lori Ward, the victim's former wife. Ms. Ward testified that she and the victim had married in 1999 and had divorced four years later due to the victim's alcoholism. Ms. Ward denied that the victim had ever been violent toward her during their marriage, even when he had been drinking, and denied that he had ever "lash[ed] out" or hit her.

Based on this evidence, the jury convicted the defendant as charged of one count of aggravated assault but acquitted the defendant of the other charges. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of four years' incarceration, suspended to supervised probation. Following the denial of her timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the evidence was insufficient to support her conviction and that the trial court erred by admitting certain evidence. We will address each issue in turn.

*I. Sufficiency*

The defendant first contends that the evidence adduced at trial was insufficient to sustain her conviction of aggravated assault. Specifically, the defendant argues that the State failed to prove that the victim had sustained a serious bodily injury, that the proof did not establish that the skillet was used as a deadly weapon, and that self-defense was sufficiently established by the proof to show reasonable doubt of her guilt.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated assault is an intentional or knowing "assault as defined in § 39-13-101(a)(1)" that is committed via the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii). Assault, as is relevant to this case, occurs when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another." *Id.* § 39-13-101(a)(1). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2).

In the instant case, the defendant, although charged with two counts of aggravated assault and two counts of domestic assault, was convicted of only a single count of aggravated assault. That particular count charged her with "unlawfully and knowingly caus[ing] bodily injury to [the victim], by use or display of a deadly weapon, to-wit: SKILLET, in violation of T.C.A. [§] 39-13-102." With regard to the defendant's first argument – that the State failed to prove the element of serious bodily injury – such argument is misplaced. The defendant was neither charged with nor convicted of aggravated assault resulting in serious bodily injury to the victim, *see* T.C.A. § 39-13-102(a)(1)(A)(i); rather, the relevant charge and conviction related to the aggravated assault committed "by use of display of a deadly weapon," *see id.* § 39-13-102(a)(1)(A)(iii).

The proof at trial established that, on November 8, 2013, both the defendant and the victim had been arguing and consuming alcohol over the course of the day. The victim eventually fell asleep on the sofa while the defendant was seated in a nearby chair. The victim was later jarred awake when the defendant struck him in the head with an iron skillet, causing him pain and leaving him with a large knot and a cut on the top of his head. When Officer Collins arrived at the Lambs' residence, he discovered the victim to be "badly injured" with a "large knot on top of his head that was bloody." The victim told Officer Collins that the defendant had struck him on the head with the skillet while he was asleep.

The defendant testified that, on November 8, she had been the victim of a vicious attack at the hands of the victim, in which he had thrown her into walls, repeatedly punched her in the back of the head, and dragged her through the house. She admitted to hitting the victim with the skillet, although she claimed that she acted in self-defense, grabbing the skillet out of a cabinet while the victim dragged her through the kitchen. When Officer Collins first encountered the defendant, he noticed that she smelled of alcohol but saw no visible injuries to her person. Although the defendant claimed to have suffered a concussion, medical professionals at the hospital told Officer

Collins that the defendant did not have a concussion. When the defendant learned that she was being arrested for assaulting the victim, she became "extremely angry" and "belligerent" and told Officer Collins that she "should have just killed" the victim.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence strongly supports the defendant's conviction of aggravated assault by use of a skillet as a deadly weapon. This court has previously found a "frying pan" to be a deadly weapon, *see State v. Jose Lemanuel Hall, Jr.*, No. M2013-02090-CCA-R3-CD, slip op. at 17 (Tenn. Crim. App., Nashville, Sept. 5, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015), and the defendant does not dispute its classification as such. Instead, the defendant argues that the proof did not sufficiently establish that she *used* the skillet as a deadly weapon. In so arguing, the defendant is effectively arguing that she used the skillet in a defensive manner. Although the defendant claimed that she struck the victim with the skillet in self-defense, the jury heard and rejected this testimony, as was its prerogative. *See Cabbage*, 571 S.W.2d at 835.

## II. Admission of Witness Testimony

The defendant also contends that the trial court erred by permitting Ms. Ward to offer evidence of the victim's peaceful nature without allowing the defense to offer testimony of the victim's prior bad acts. We disagree.

During rebuttal testimony at trial, the following exchange occurred between the State and Ms. Ward:

> Q:     Now, let's talk a little bit about [the victim] in terms of violence. Was he violent during your marriage?
>
> A:     No.
>
> Q:     What about when he was drunk?
>
> A:     No.
>
> Q:     So, if he was very intoxicated and had been drinking for days, was he – did he lash out at you?
>
> A:     No.
>
> Q:     Did he ever strike you?

A: No.

Defense Counsel: Your Honor, relevance. This is years before this happened. And I have been admonished many times.

The trial court conducted a bench conference, during which the trial court and the prosecutor engaged in conversation about the appropriateness of allowing the State to continue questioning Ms. Ward about the victim's character. Defense counsel made no argument. Ultimately, the trial court sustained the defendant's objection to relevance and informed the prosecutor that it would "allow the questions that have been asked and answered to stand" but that it was "cutting it off right there." On cross-examination, defense counsel only asked how often the victim visited his son with Ms. Ward.

The defendant now argues on appeal that the trial court "should have allowed further character and history evidence or no character evidence should have been allowed at all." The record is clear, however, that the defendant objected to the line of character questioning on the basis that it was irrelevant, not that the questions involved potentially inadmissible character evidence. "A party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994); *see also State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding that a party cannot object on one ground at trial and assert new basis on appeal). Thus, the defendant has waived our consideration of this issue.

*III. Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 10 -